```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| MAVE HOTEL INVESTORS LLC,<br><br>        Plaintiff,<br><br>    -v-<br><br>CERTAIN UNDERWRITERS AT<br>LLOYD'S LONDON, et al.,<br><br>        Defendants. | 21-cv-08743 (JSR)<br><br>MEMORANDUM ORDER |

JED S. RAKOFF, U.S.D.J.:

This case involves the claims of plaintiff Mave Hotel Investors ("Mave") against its property insurer Certain Underwriters at Lloyd's London ("Lloyd's") for property damage Mave contends occurred at its hotel following the termination of its contract with Acacia Network Housing ("Acacia") to house families with children. After briefing and argument on Lloyd's motion for summary judgment, the Court entered a bottom-line order on February 17, 2023 denying in large part Lloyd's motion, although granting it with respect to any claim by Mave for consequential or punitive damages. See 2/17/23 Order, Dkt. 118. This Memorandum Order sets forth the reasons for that decision.

I.  **Background**

Mave owns a small hotel on 28th Street and Madison Avenue in Manhattan, New York with 74 guest rooms.[1] For three years from October

---

[1] The facts set forth herein are undisputed except where otherwise noted and are taken from the parties' memoranda of law or Rule 56.1 statements and responses. In addition, all capitalized

1

2017 through October 2020, Mave was under contract with Acacia to provide temporary housing to homeless families and their children. That contract was ultimately terminated by October 2020. Mave claims that its rooms were badly damaged before the families housed under the Acacia contract left. It has separately sued Acacia in New York State court for this damage, alleging that it paid $1.4 million to make needed repairs.

Mave also submitted a claim for these repairs to Lloyd's, from which it had obtained a general property insurance policy effective from January 29, 2020 through January 28, 2021. Lloyd's denied coverage on the ground that any damage was in fact caused by ordinary wear and tear -- a category explicitly excluded from coverage under Mave's policy. Mave subsequently sued Lloyd's for its failure to provide coverage. The case was initially assigned to Judge Torres.

U.S. Bank National Association ("U.S. Bank"), which contends it holds the mortgage to Mave's physical property and that it is entitled under Mave's property insurance policy to the proceeds of a claim for property damage, moved to intervene in this case, a motion which both Mave and Lloyd's opposed. Magistrate Judge Cott, to whom the matter was initially referred, recommended granting the motion, finding that U.S. Bank had adequately asserted an interest in the litigation,

---

terms here used refer to the definitions set forth in this order, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

although not resolving the merits of its rights to any proceeds. See 8/16/22 Report and Recommendation, Dkt. 68. That recommendation was accepted by Judge Torres. See 9/22/22 Order, Dkt. 78. U.S. Bank then filed a complaint, seeking a declaratory judgment that Lloyd's is obliged to pay it under the policy and that that Lloyd's breached its contract by not paying, and a declaratory judgment for lost "business income" at Mave's hotel. U.S. Bank Compl. ¶¶ 23-37, Dkt. 82. The case was subsequently reassigned from Judge Torres to the undersigned prior to summary judgment briefing and argument.

Lloyd's moved for summary judgment on three primary grounds. *First*, it argued that Mave failed to adduce any evidence demonstrating that its loss occurred during the relevant policy period. Defs. Mem. Supp. SJ at 11-13, Dkt 103. *Second*, it argued that Mave failed to provide timely notice of its claimed damages. Id. at 13-15. *Third*, it argued that Mave failed to rebut Lloyd's expert testimony demonstrating that any loss was caused by ordinary wear-and-tear explicitly excluded from coverage under the policy. Although it is a close call as to Lloyd's' first and third arguments, the Court ultimately concludes that disputes of fact exist that preclude entry of summary judgment in Lloyd's' favor at this stage. However, the Court agrees that Mave cannot recover consequential or punitive damages.

### I. Whether evidence exists showing that some loss occurred during the 2020 policy period.

Lloyd's first argues that Mave failed to introduce evidence demonstrating that its loss occurred in the 2020 policy period (January

3

29, 2020 – January 29, 2021) (the "Policy Period"). See Weintraub v. Great N. Ins. Co., No. 21-cv-07965, 2022 WL 17993903, at *2 (S.D.N.Y. Dec. 29, 2022) ("Under New York law, an insured bears the burden of demonstrating that a loss occurred during the period covered by the relevant policy."). Lloyd's cites deposition testimony from Mave's property manager, Sol Chakalo, testifying that he discovered new damage to Mave's hotel rooms throughout the entire 2017-2020 period that Acacia occupied the policy, not just in the 2020 Policy Period. See, e.g., Liebowitz Decl., Ex. L (Dkt. 99-20) (Chakalo) 73:10-13 (Q: "Every year they occupied the hotel, you notified them of alleged damages to the hotel?" A: "Yes."); Id. 72:9-11 (Q: "Did you discover damages to the hotel property from 2017 onward?" A: "Yes."). Lloyd's accordingly argues that the damage Mave is claiming -- reflected in photographs taken by Chakalo following Acacia's vacating the Mave hotel -- might reflect damages occurring before the Policy Period.

Mave responds that the damage occurred "as a matter of law" within the Policy Period. Mave Mem. Opp. SJ at 18, Dkt. 106. It relies primarily on a declaration submitted by Fred Velastegui, who asserts he was working at Mave Hotel from July 2017 through October 2020 as its director. See Velastegui Decl. ¶ 2, Dkt. 107. Valestegui claims that he and Mave's property manager Chakalo regularly received reports from the hotel's housekeeping staff about damage to hotel rooms after the hotel cleaning staff cleaned it, that the damage relevant to this lawsuit "was first reported by the housekeeping staff in late September 2020 or early October 2020," that he "had not seen any of the damage

4

before," and that he "believe[s] that . . . all of that damage occurred in the period from early September 2020 through early October 2020." Id. ¶ 7. Mave further argues that because it performed regular repairs that were inspected by New York twice per year, it is implausible to think the relevant damage occurred outside the Policy Period. Mave Mem. at 19. Further, Mave argues that it is plausible to think that all the damage occurred immediately before Acacia vacated the hotel as families were disgruntled they would have to move. Id. Mave finally points out that Lloyd's also has not introduced evidence as to when the damage occurred. Id.

Lloyd's argues that the Court should ignore the Velestegui declaration because Velastegui was not included in Lloyd's' Rule 26(a) disclosures, even though he identifies himself in his declaration as the "Hotel Director." Velastegui Decl. ¶ 2. Mave responds that any failure to disclose Velastegui was harmless -- and that, therefore, this Court should not exclude his testimony under Fed. R. Civ. P. 37(c) -- because one of the witnesses Mave did identify as a hotel manager described Velastegui in his deposition testimony as "[a] site manager" with the "same responsibilities" as him. See Liebowitz Decl., Ex. L (Chakalo) 57:2-3.

It is a close call whether this fairly brief reference was sufficient to put Lloyd's on notice of Velastegui's involvement such that consideration of his affidavit at this stage would not be prejudicial, especially since the disclosed hotel manager (Chakalo) also testified that Velestegui had "[n]ot really" "perform[ed]

5

periodic inspections of the rooms." Id. 101:13-15. However, the Court need not decide this issue because it concludes, relying solely on Chakalo's testimony, that a genuine dispute of fact exists as to whether at least some portion of Mave's loss occurred during the policy period. Specifically, Chakalo testified that he reported incidents of damage caused by Acacia's guests "[e]very year [Acacia] occupied the hotel." Liebowitz Decl., Ex. L (Chakalo) 72:16-73:13. The implication is that while some (and perhaps most) of the damage Mave now claims may have occurred prior to the Policy Period, there were incidents of damage in 2020 that might fall under the policy. Id. Based on this testimony, the Court concludes that Mave has -- just barely -- met its burden to adduce evidence that at least some loss occurred during the 2020 Policy Period. At trial, the parties will of course be free to argue over precisely how much occurred during the Policy Period, and it will be Mave's burden to demonstrate that any claimed loss occurred during the relevant period.[2]

## II. Lloyd's' late-notice defense was waived

Lloyd's also argues that judgment should be entered in its favor because Mave failed to give it "prompt notice" of its loss as required under its policy. It is undisputed that Mave learned of at least some of the damage it is asserting in this case by September 2020, when

---

[2] As noted above, the Court finds that Mave has met its burden to adduce evidence that some loss occurred during the Policy Period without considering Velastegui's declaration. To the extent Mave plans to rely on Velastegui's testimony at trial, Lloyd's may depose him first.

housekeepers reported it to Hotel Property Manager Sol Chakalo. Liebowitz Decl., Ex. L (Chakalo) 81:5-13; Mave Rule 56.1 Counterstatement ¶ 60. It is likewise undisputed that Lloyd's was not notified of any damage until January 6, 2021 -- more than at least three months later. Compl. ¶¶ 16-18. New York courts routinely hold that periods shorter than this 3-month delay suffice to create grounds to deny coverage where the policy has a similar "prompt notice" requirement. See, e.g., Am. Ins. Co. v. Fairchild Indus., Inc., 56 F.3d 435, 440 (2d Cir. 1995) ("Under New York law, delays for one or two months are routinely held unreasonable."); Am. Home Assur. Co. v. Republic Ins. Co, 984 F.2d 76, 78 (2d Cir. 1993) (finding notice was untimely as a matter of law where the delay was at least 36 days, and collecting cases New York cases describing notice as late given similar delays).

Indeed, both in its papers and at oral argument, Mave has largely conceded that it did not provide prompt notice as a matter of law. Instead, it argues that Lloyd's waived this defense by not raising it explicitly when it disclaimed coverage on April 22, 2021 on the basis that the claim was covered by the policy's "wear and tear" exclusion, in a letter that also included general "reservation of rights" language. Mave Mem. Opp. SJ 4-7.[3] Because Lloyd's disclaimed coverage

---

[3] The relevant disclaimer letter reads: "The policy excludes damages caused by wear and tear; therefore, [Lloyd's is] unable to afford coverage . . . The actions of [Lloyd's] . . . should not be construed as a waiver of any rights . . . To the contrary, [Lloyd's] reserve each and every right they have under the policy and at law."

7

on wear-and-tear but not late-notice grounds, even at a point in time when it likely could have known all the facts that might have led it to disclaim coverage on late notice grounds, Mave argues that Lloyd's waived the late notice defense. In this regard, it cites the Second Circuit's decision in New York v. AMRO Realty Corp., 936 F.2d 1420 (2d Cir. 1991), which noted that "under New York law, the act by an insurer of disclaiming on certain grounds but not others is deemed conclusive evidence of the insurer's intent to waive the unasserted grounds." Id. at 1432 (emphasis in original); see id. ("This court has unequivocally recognized the rule . . . that when one specific ground of forfeiture is urged against the claim, and a refusal to pay is based upon a specific ground, all other grounds are waived.'")

However, AMRO "d[id] not address [t]here the case where the insurer's disclaimer of coverage based on specified grounds is accompanied by an express and unequivocal statement that other grounds for disclaimer are reserved and not waived," although it found that the reservation-of-rights language in that case -- referring to possible future denials based on the discovery of new facts -- did not apply to save a late notice defense where the insurer already knew the facts giving rise to that defense. Id. at 1433 & n.13. Lloyd's therefore argues that AMRO is inapplicable because of the language in its April 2021 denial letter "reserv[ing] each and every right [it]

---

Newman Decl. Ex. E., Lloyd's Disclaimer of Coverage Letter, Dkt. 100-5 at M004124.

ha[s] under the policy and at law." Newman Decl. Ex. E., Lloyd's Disclaimer of Coverage Letter, Dkt. 100-5 at M004124.

As discussed above, AMRO expressly left open the question of whether such an express reservation of rights would prevent waiver, including where, as here, the reservation is generic and does not specifically call out any defense. And the cases on this question are mixed. For instance, Lloyd's cites New York Marine and Gen Ins. Co. v. Travelers Prop. Cas. Co., 485 F. Supp. 3d 398, 408 (S.D.N.Y. 2020), in which a court in this district found that an insurer who denied coverage on the basis of something other than late notice but also included in its denial a general reservation of rights could later assert the late notice defense without waiver. Id. at 409 ("Travelers' reservation of rights precludes NY Marine's waiver argument. Travelers' reservation was broad and encompassed future disclaimer based on insufficient or untimely notice."). However, New York Marine did not discuss Amro except in passing, and the precedents it relied on with respect to the effect of reservation-of-rights clause had to do with insurers' reservations during the investigation process, not within the final denial letter. Id. (citing Globecon Grp., LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006) for the proposition that "[u]nder New York law, however, an express reservations of rights 'precludes arguments both as to waiver and as to equitable estoppel,'" but not discussing the context of the reservation-of-rights at issue in Globecon); Globecon, 434 F.3d at 176 (discussing an insurer's reservations of rights in its communications

9

with the insured throughout the investigation, rather than in the ultimate denial of coverage letter).

The Court finds more persuasive a different case from this district: Hunt Constr. Grp., Inc. v. Berkely Assurance Co., 503 F. Supp. 3d 106 (S.D.N.Y. 2020), in which Judge Oetken explicitly considered the question left open by AMRO -- whether a denial of coverage on one basis suffices to waive other grounds of denial where an insurer includes in its denial a generic reservation of rights -- and concluded that "boilerplate language" in a denial of coverage letter "[i]s insufficient" to preserve specific alternative grounds for that denial.[4] Id. at 115. The court in Hunt noted that "[w]hile some courts have found a reservation of rights to preclude a waiver defense, they usually do so in instances in which the reservation of rights expressly raises the specter of a late-notice defense." Id.

The Court also notes that while there is a strong policy rationale for allowing insurers broad discretion to rely on reservations-of-rights during their initial investigation -- so as to not incentivize

---

[4] Hunt was subsequently withdrawn on other grounds after reconsideration. Id., 2021 WL 4392520, at *1-2 (S.D.N.Y. Sept. 24, 2021). Specifically, Judge Oetken determined in light of recent precedent that because the policy in question in that case was a 'claims-made-and-reported' policy, a condition precedent to coverage was that a claim need to have been made and reported within the policy period. Id. at *1. Because the claim was made outside the policy period, no coverage existed under the policy at all, and "waiver is inapplicable . . . where the issue is the existence or nonexistence of coverage." Id. at *2. Here, that issue does not matter, since, whether or not the insurance policy is a "claims-made-and-reported" policy, Mave claimed on January 6, 2021, before the policy ended later that month.

insurers to deny coverage immediately on bases they might later reconsider so as to avoid waiving them -- it makes much less sense to allow "boilerplate" reservation-of-rights language in a final denial of coverage to preserve defenses not explicitly raised at that point. By the time the insurer denies coverage, there should already be a full record and a complete investigation, and there is much less reason why insurers should be allowed to "reserve" generic unnamed defenses in the event of later court challenge.

For these reasons, the Court concludes that the generic reservation of rights language in Lloyd's letter denying coverage does not suffice to avoid waiver of its late notice defense under AMRO.

### III. Whether an issue of fact exists as to whether coverage was properly excluded under the wear-and-tear exception

Lloyd's finally argues that it is entitled to summary judgment because Mave has failed to produce any evidence showing that its claimed damages were not properly excluded from coverage under the policy's wear-and-tear exclusion. It is undisputed that the relevant policy explicitly excludes coverage "for loss or damage caused by or resulting from . . . [w]ear and [t]ear." Mave Response to Lloyd's Rule 56.1 Statement ¶ 10. See Superhost Hotels Inc. v. Selective Ins. Co. of Am., 160 A.D.3d 1162, 1163 (N.Y. App. Div. 2018) (concluding that an insurance policy's wear-and-tear provision meant to exclude "wear and tear" in the ordinary sense, defined in Merriam Webster's online dictionary as "the loss, injury, or stress to which something is subjected by or in the course of use"). Lloyd's contends that all the

11

claimed losses here (which include torn carpets, wall abrasions, and things of that nature) -- are the sorts of damage that would be expected in the ordinary course and therefore fall under the wear-and-tear exclusion. It cites in this respect the conclusions of its expert, Dennis Morrissey, who inspected the hotel rooms and concluded that all the damage would be expected from ordinary use. See Morrissey Decl. ¶ 17, Dkt. 101.

Mave has not introduced any expert testimony contradicting Morrissey's evidence, and so Lloyd's argues that Mave has thereby failed to create a fact issue undermining the prima facie showing made by Lloyd's that the damages fall under the wear-and-tear exception. See Superhost, 160 A.D.3d at 1164 ("We agree . . . [that an engineer's expert report concluding that damage was caused by wear and tear] w[as] sufficient to meet defendant's burden to establish on a prima facie basis that plaintiff's loss was caused by wear and tear within the meaning of the policy exclusion, shifting the burden to plaintiff to establish the existence of a triable issue of fact."). Mave offers three responses, only one of which is convincing.

*First*, Mave argues that the policy's "wear and tear" exclusion in fact applies only to "natural phenomena," not physical damage by people of the sort at issue here. Mave Opp at 7-10. Mave cites in this regard 242-44 E. 77th Street, LLC v. Greater New York Mut. Ins. Co., 31 A.D.3d 100 (N.Y. App. Div. 2006), in which New York's First Department held that an insurance policy's exclusion for "settling, cracking, shrinking, or expansion" did not apply to prevent a claim

12

for "direct physical loss" caused by the shifting of a building as a result of an adjoining property owner's construction activities. Id. at 103-04. This because the policy's "shifting" exclusion came as one part of a long list of exclusions including "wear and tear," as well as "rust, corrosion, fungus, decay, deterioration," "nesting or infestation," and "smog" that the court concluded all applied to "to damage caused by natural phenomena." Id. Given that context, the court read the "settling" exclusion to only apply to shifting of the building caused by "natural" geological movements, rather than by someone else's nearby construction activities. Id. The case did not actually turn on any interpretation of the term "wear and tear," although in passing the court referred to that exclusion along with the others just mentioned as all bearing on only "natural" phenomena. Id.

242-44 E. 77th St. is simply not on point. There, the court was not construing the term "wear and tear," and that term came up only as part of a list of exclusions which all appeared to involve natural phenomena. New York courts have otherwise construed "wear and tear" exclusions as covering "wear and tear" in the ordinary, dictionary sense, meaning "loss, injury, or stress to which something is subjected by or in the course of use." Superhost, 160 A.D.3d at 1164. Indeed, elsewhere in its papers, Mave appears to concede that "wear and tear" should be construed according to its ordinary meaning, incorporating human use. See Mave Opp. at 11, Dkt. 106 ("The 'ordinary and popular' meaning of 'wear and tear', as used in an insurance policy, is 'damage which results from 'normal' or 'ordinary' usage.'"). As such, Mave is

13

wrong to argue that the "wear and tear" exclusion applies only to damage caused by natural causes.

*Second*, Mave argues that Morrissey's expert report is inadmissible because neither Morrissey's general engineering training nor his specific work evaluating structural damage in hundreds of residential and commercial properties qualifies him to opine as to whether the damage here was caused by negligent or intentional conduct of the Acacia residents, versus ordinary wear-and-tear. Mave. Opp. at 13. Mave further argues that Morrisey's report -- based on his conclusions following a 2.5 hour on-site inspection -- is not based on "reliable principles and methods." Id. at 14; see Fed. R. Evid. 702(c).

This argument also is unpersuasive. Morrissey represents he has "over 40 years of experience in the field of civil engineering, including engagements in structural damage assessments and construction project management consulting." Morrissey Decl. ¶ 4. He has conducted over 1,500 "property inspections and damage assessments." Id. ¶ 7. Relying on this experience, Morrissey conducted a detailed inspection of the Mave Hotel and discussed its use over the relevant time period with the hotel manage. He concluded, based on that inspection, that "[t]he conditions within each of the rooms were consistent with normally expected wear and tear that occurred during the reported family occupancies over a 3 year period," that "there was no damage within the bathrooms other than some cracked mirrors, no damage to wall-hanging television sets, and no large sections of wall

14

coverings punctured or missing," and that there was "no evidence during the inspection of any damage that was consistent with a deliberate attempt to cause damage within the rooms, other than possibly some damage caused by very young children." Id. ¶ 17. Similarly, he concluded that "[t]he abrasions on the furnishings, loose and missing door frames and desk drawer fronts, some of the punctures in the walls, the tears in the fabric headboards and canvas artwork, and most or all the other noted conditions would not be unusual for rooms occupied by children of various ages in confined, crowded conditions." Id.

Morrisey's 40 years of civil engineering experience and structural damage assessment, coupled with over 1,500 specific property inspections, seems more than adequate to make him qualified to render an opinion about what caused the property damage in this case. Further, while Mave contends Morrisey's opinion is not the result of "reliable principles and methods," Morrisey's general approach -- speaking with Mave's property manager to understand how the rooms were used over the relevant time period, then physically inspecting all 74 rooms and photographing and documenting his inspection -- appears sufficiently reliable, and Mave has not pointed to any alternate steps that Morrissey could have but did not take. As such, the Court agrees that Lloyd's has introduced prima facie apparently admissible evidence that indicates that Mave's asserted damages result from wear-and-tear that is excluded under Mave's policy.

Nevertheless, the Court cannot conclude that there is no genuine dispute of fact as to whether the claimed damages qualify as wear-and-

15

tear. The record includes pictures of the damaged rooms taken by Mave's property manager Sol Chakalo. Liebowitz Decl. Ex. N., Dkt. 99-22 -- 99-40. While many of the images include tears or scratches that a reasonable fact-finder certainly <u>could</u> conclude qualify as wear-and-tear, this Court cannot weigh competing evidence at the summary judgment stage, and it cannot reject the possibility that a reasonable fact-finder, viewing the claimed damage, might conclude that at least some of it consists of greater damage than that caused by ordinary use. <u>Superhost</u>, 160 A.D.3d at 1163. And while Morrisey's report is certainly relevant evidence tending to show that the claimed damages consist merely of wear-and-tear, the Court cannot conclude on this record that no reasonable fact-finder could disagree with Morrisey's conclusions.

Because a dispute of fact therefore exists as to whether Mave's claimed damages fall in whole or in part outside the wear-and-tear exclusion, this Court cannot enter summary judgment in Lloyd's favor.

**IV. Punitive and Consequential Damages**

Finally, Lloyd's moved for summary judgment as to any claim for either punitive or consequential damages, which were alleged both in Mave's complaint and U.S. Bank's complaint as a third party intervenor. Lloyd's Mem. 22-23. Consequential damages may include damages that, although caused by a breach, are not "the natural and probable consequence of" it. <u>Bi-Economy Market, Inc. v. Harleysville Ins. Co. of New York</u>, 886 N.E.2d 127, 130 (N.Y. 2008). Consequential damages are recoverable in breach-of-contract actions -- including in

16

insurance disputes -- only when such consequential damages were or should have been "reasonably contemplated by the parties" and were foreseeably "the probable result of a breach at the time of or prior to contracting." Id.

Punitive damages, meanwhile, "are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights." Rocanova v. Equitable Life Assur. Soc'y of U.S., 634 N.E.2d 940, 943 (N.Y. 1994). "[A] private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." Id. at 944.

Here, neither Mave nor U.S. Bank have introduced any evidence creating a fact issue over potential entitlement to either consequential or punitive damages. Indeed, when explicitly asked at oral argument, counsel for Mave could not point to any such evidence. As such, neither Mave nor U.S. Bank may pursue damages other than payout on the insurance policy at trial.

SO ORDERED.

New York, NY
April 10, 2023

JED S. RAKOFF, U.S.D.J.